IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHARLES HEMINGWAY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No.01-1520 |
| STANLEY FALOR, Medical Director; | ) | Judge Alan N. Bloch/ |
| CHARLES ROSSI, administrator; | ) | Magistrate Judge |
| MORRIS HARPER, physician; ROBERT | ) | Amy Reynolds Hay |
| SOLARCZYK, physician assistant; | ) | |
| GINA CERASO, physician assistant, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Re: Doc. 84 |

REPORT AND RECOMMENDATION

RECOMMENDATION

It is recommended that Defendants' Motion For Summary
Judgment (Doc. 84) be granted and that summary judgment be
entered in favor of the Defendants as to Plaintiff's federal law
claims against the Defendants and that the state law claims be
dismissed without prejudice to being brought in state court.

REPORT

Charles Hemingway ("Plaintiff"), a state prisoner, has filed
a civil rights suit against administrative and medical personnel
who work at SCI-Greene where Plaintiff was formerly imprisoned.[1]
Plaintiff alleges that the Defendants violated his Eighth
Amendment rights in three ways: (1) by not referring Plaintiff
for treatment outside the prison; (2) by cancelling a recommended

---

[1] Plaintiff is currently imprisoned at SCI-Graterford.

medical procedure, namely a liver biopsy; and (3) by not ensuring Plaintiff access to a physician when he needed one.  The only remaining defendants in the suit are Stanley Falor, M.D., the SCI-Greene medical director and a physician who treated Plaintiff, Morris Harper, M.D., a prison doctor who also treated Plaintiff, and Robert Solarczyk, a physician's assistant (collectively, the "Defendants").[2]  Presently before the court is the Defendants' Second Motion for Summary Judgement.  For the reasons set forth below, the district court should grant the motion.

### A.  Applicable Legal Principles

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The moving party "has the burden of showing there is no genuine issue of material fact, and once the moving party has sustained its burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial."  Williams v. Borough of West Chester, 891 F.2d 458, 464 (3d Cir. 1989)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986)).  Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to

---

[2] This court previously dismissed the action as against Charles Rossi, SCI-Greene Medical Administrator, and Gina Ceraso, a physician's assistant. See Docs. 35 & 42.

interrogatories and admissions on file, together with the
affidavits, if any, show that there is no genuine issue of
material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. Proc. 56(c).

**B.  Discussion**

The Supreme Court has explained that analysis of a violation
of the Eighth Amendment involves a two pronged inquiry: (1) an
objective inquiry into the qualitative nature of the harm
suffered by the victim of the alleged punishment and (2) a
"subjective inquiry" into the mind of the person inflicting the
harm.  See Wilson v. Seiter, 501 U.S. 294 (1991).    In cases
such as this one, which involves a purported denial of medical
care,  to prove the subjective component of an Eighth Amendment
claim a plaintiff has the burden of proving that the defendant
acted with deliberate indifference.  Estelle v Gamble, 429 U.S.
97 (1976). "[D]eliberate indifference" occurs when a "prison
official knows of and disregards an excessive risk to inmate
health or safety; the official must both be aware of facts from
which the inference could be drawn that a substantial risk of
serious harm exists and he must also draw the inference."  Farmer
v. Brennan, 511 U.S. 825, 837 (1994).  As a corollary of the
deliberate indifference standard, negligence by medical personnel
and physicians in treating prisoners is not sufficient to state
an Eighth Amendment violation.  Estelle, 429 U.S. at 105-06.

3

    1.  <u>Defendant Falor</u>

Plaintiff claims that Defendant Falor violated Plaintiff's Eighth Amendment rights by not approving him to receive a liver biopsy because of the cost of the procedure or other non medical reasons.  The record before the court reveals the following.

On or about May 2, 1995, Plaintiff was incarcerated at SCI-Greene.  Doc. 85, Exhibit B, Affidavit of Dr. Falor at ¶ 3. (Hereinafter "Falor Aff. at ¶ __.").  Upon arrival at SCI-Green, Plaintiff had a history of Hepatitis C and intravenous drug use. <u>Id</u>.[3]  According to the complaint, in 1996 he was diagnosed as

---

[3]  Plaintiff seems to contest that he had Hepatitis at the time of his entrance in SCI-Greene.  See Doc. # 87, "Plaintiff's Statement of Disputed Factual Issues" at ¶ 1.  Moreover, his theory of the case seems to be that the prescription of Lipitor and his taking this medication was the cause of his Hepatitis C.  <u>See</u>, <u>e.g.</u>, Doc. 87, Plaintiff's Brief at 5, 2nd full ¶ ("the medical staff prescribed a contraindicated drug, to his existing medical condition, liver disease, which subjected and/or caused him to contract other disease, such as, hepatitis . . .").  First, the court takes judicial notice of the fact that Hepatitis is caused by a virus. See footnote 3 infra and accompanying text. Plaintiff offers no medical evidence that taking Lipitor caused him to contract Hepatitis A, B or C.  Furthermore, the earliest that Plaintiff alleges that he was prescribed Lipitor is in 1997.  Doc. 3 at ¶ 16; Doc. 87, Plaintiff's Declaration at ¶ 8. However, the medical records from SCI-Greene indicate that he had tested positive for the Hepatitis C virus as early as October 7, 1996. Doc. 85, Ex. G at unnumbered p. 69.  Hence, Plaintiff's unsubstantiated claims of Lipitor having caused him to contract Hepatitis C simply does not create a genuine issue of material fact here.
    To the extent that Plaintiff is asserting that there is a material factual dispute as to whether he had Hepatitis C at the time of his entrance into SCI-Greene, Plaintiff offers no medical evidence that he did not have Hepatitis C at the time of his entrance in SCI-Greene to contradict Dr. Falor's affidavit that Plaintiff did have Hepatitis C at that time.  Even if Plaintiff were to swear that he did not have Hepatitis C, and such a sworn statement could constitute competent evidence to establish that he did not, Dr. Falor's affidavit establishes that he – and apparently the other Defendants – believed

having chronic liver disease[4] and was referred to an outside liver specialist in 1997.  Doc. 3 at ¶ 10.

Plaintiff contends that Defendant Harper and the outside specialist told Plaintiff a biopsy was needed to determine the extent of liver damage in order to prescribe proper medication. Plaintiff allegedly consented to the biopsy procedure.  Doc. 3 at ¶ 13.  Plaintiff further alleges that Dr. Harper and the outside specialist, i.e., Dr. Stokes, promised that an appointment for

---

Plaintiff had Hepatitis C and their operating under this belief, even if mistaken, does not support a claim that they were deliberately indifferent to Plaintiff.  See Farmer, 511 U.S. at 847.  Thus, even a sworn statement by Plaintiff that he did not have Hepatitis C at the time of his entrance into SCI-Greene simply would not establish a genuine issue of material fact with respect to establishing the subjective prong of an Eighth Amendment claim on the part of the Defendants so as to preclude the entry of summary judgment.

[4] Plaintiff appears to be under the mistaken impression that Hepatitis C and "chronic liver disease" are totally unrelated.  See Doc. # 30, Exhibit C, Affidavit of the Plaintiff, at ¶ 5 ("On January 8, 1997, I seen [sic] Dr. Stokes for the first time, and I was examined, but not for Hepatis C, I was specifically told by Dr. Stokes and Harper, that I had liver damage and that a biopsy would have to be done in order to determine the amount of damage so that treatment could be prescribed with the use of interferon."); Doc. # 31, at ¶ 2 ("They [Defendants] claim that I did not have or was [not] diagnosed as having liver disease because they had evaluated the medical condition as being hepatitis C. . . .."); Doc. 87, Plaintiff's Declaration at ¶ 5 ("An outside liver specialist was required due to elevated liver injury tests, not hepatitis C.").  Although not necessary to the court's disposition, the court notes for the sake of clarification that "[t]he hepatitis C virus ranks with alcohol as the major cause of chronic liver disease and cirrhosis in the United States.  Infection with this virus causes inflammation of and low grade damage to the liver that over several decades can lead to cirrhosis."  http://www.niddk.nih.gov/health/digest/pubs/cirrhosi/ cirrhosi.htm#causes (website of the National Digestive Diseases Information Clearinghouse).

the biopsy would be set up with the probable use of interferon as treatment. Doc. 3 at ¶ 13.

Plaintiff complains that the biopsy has not been scheduled or performed.  He claims that on September 8, 2000, he was informed by Dr. Falor that the biopsy was later cancelled because of cost and a belief that the interferon (apparently the drug that was going to be used to treat the liver condition) would cause more harm than good.  Doc. 3 at ¶ 15.   In contrast, however, Dr. Falor attests that the "liver biopsy was not necessary to evaluate Mr. Hemingway's Hepatitis C; nor would a liver biopsy be warranted to determine the type of medication necessary to prescribe to Mr. Hemingway."  Falor Aff. at ¶ 9. Dr. Falor also attests that on February 8, 1997, "Mr. Hemingway was examined by a Gastrointestinal Specialist[5] and a liver biopsy was not approved and therefore not completed."  Falor Aff. at ¶ 8.

Plaintiff contends that Dr. Falor's failure to proceed with Dr. Stokes' recommendation for a liver biopsy constitutes deliberate indifference.  As noted, it was Dr. Falor's professional opinion that the biopsy was not necessary for the

---

[5]  The record does not disclose whether this Gastrointestinal specialist who examined Plaintiff in February 1997, was Dr. Stokes, who had examined Plaintiff in January or whether it was another specialist.

treatment of Plaintiff's liver problems and that the procedure would be scheduled.   Doc. 3 at ¶ 13.

Differences of opinions among medical professionals regarding the proper course of treatment and/or choice of diagnostic techniques to be used does not state a violation of the Eighth Amendment.  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  See also, Garvin v. Armstrong, No. 97 C 4233, 1999 WL 970371, at * 5 (N.D. Ill. Oct. 20, 1999) (Differences in the "assessment of the risk/benefit calculation . . . among medical experts do not make out an Eighth Amendment claim."), aff'd, 236 F.3d 896 (7th Cir. 2001); Estate of Cole v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996)("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."); Estelle, 429 U.S. at 107 ("[T]he question whether an X-ray--or additional diagnostic techniques or forms of treatment--is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....").

On this record, there is no genuine issue of material fact concerning whether Dr. Falor was deliberately indifferent to Plaintiff's medical needs.  Rather, the record demonstrates that Dr. Falor was concerned that Plaintiff receive testing for Hepatitis C, ordered appropriate tests, ordered/approved a

consult with an outside liver specialist, and ordered further tests upon recommendation of the outside liver specialist  but ultimately did not agree that Plaintiff needed a liver biopsy.[6] This simply does not evince deliberate indifference on the part of Dr. Falor.  Nor, given the uncontradicted evidence of record that a biopsy was not necessary to treat Plaintiff's Hepatitis C, has Plaintiff provided evidence that denying him a liver biopsy caused him a deprivation of the minimum measure of life's necessities.  To be clear, a liver biopsy is a diagnostic test not a treatment.  To be denied a diagnostic test that, for all the evidence of record shows, is not necessary for purposes of treating Plaintiff's Hepatitis C condition, is to be denied nothing for purposes of the Eighth Amendment's deliberate indifference test.

Plaintiff contends, however, that Dr. Falor violated Plaintiff's Eighth Amendment rights because he took the cost of the liver biopsy procedure into account in not approving the biopsy.  This however, neither singly nor in consideration with the other evidence contained in the summary judgment record establishes that Dr. Falor was deliberately indifferent.  For the rule is that cost is a legitimate consideration in determining

---

[6] There is also a note in the chart by Dr. Falor that the liver biopsy that had been approved was to be cancelled, apparently because Plaintiff was not a candidate for interferon treatment.  Doc. 85, Ex. G at unn. p. 112.

which tests to perform and which treatments to follow.  See
Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999)("it is
difficult to generalize, except to observe that the civilized
minimum is a function both of objective need [for the particular
test or treatment] and of cost.  The lower the cost, the less
need has to be shown, but the need must still be shown to be
substantial.").  Consideration of the cost of alternative
treatments and tests in light of the relative benefits of the
alternative treatments and tests simply does not per se deprive a
prisoner of the minimal civilized measure of life's necessities.
That cost is a factor in the provision of treatment outside the
prison walls supports this conclusion.  Resources are not
infinite and reasonable allocation of those resources does not
amount to deliberate indifference even if a prisoner does not
receive the most costly tests or his treatment of choice or even
a treatment recommended by some doctors but disagreed with by
other doctors.  See White v. Napolean, 897 F.2d at 110; Inmates
of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.
1979)("Courts will 'disavow any attempt to second-guess the
propriety or adequacy of a particular course of treatment . . .
[which] remains a question of sound professional judgment.'
Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977).  Implicit in
this deference to prison medical authorities is the assumption
that such an informed judgment has, in fact, been made.").

Petitioner's next claim against Dr. Falor is that he did not provide adequate medical care in an emergency situation that occurred on June 10, 2000.  As the facts surrounding this incident also involve Defendants Harper and Solarczyk, the Court will recount the record in some detail.

In 1997, Plaintiff was informed that he had high cholesterol levels and was prescribed a medication, called Lipitor, which the complaint alleges is contraindicated for him due to his liver condition.  Doc. 3 at ¶ 16.   On April 24, 2000, former Defendant Ceraso allegedly recommended that Plaintiff be again prescribed the "contraindicated" drug Lipitor, also known as Atorvastatin, without taking a medical history, asking necessary questions, or reviewing Plaintiff's medical records. Doc. 3 at ¶ 21.  Defendant Falor allegedly approved this medication without reviewing Plaintiff's medical record, or without examining Plaintiff.  Id. at ¶ 22.  Plaintiff alleges that Lipitor is contraindicated in patients with liver disease.  Attached to his complaint is a printout from a website concerning Lipitor that lists under contraindications the following: "Active liver disease or unexplained persistent elevations of serum transaminases."   On May 30, 2000, Plaintiff attended sick call, complaining of blurred vision, abdominal pain, joint and body pain, internal soreness and dry mouth.   Defendant Solarczyk told Plaintiff he was suffering side effects from the drug Lipitor and that the

10

complications would resolve themselves.  Doc. 3 at ¶ 25.
Defendant Solarczyk knew that Plaintiff had been vaccinated for
Hepatitis A and that he had been on Lipitor, but Solarczyk
purportedly sent Plaintiff back to his block without referring
him to a physician.  Id. at ¶ 26.  On June 5, 2000, Plaintiff
returned to sick call with the same complaints as the previous
time as well as a groin rash.  Defendant Solarczyk prescribed
some Micatin, a topical cream, for the groin rash but told
Plaintiff that as for the pain he was complaining about,
Plaintiff would "just have to get used to it" and that he should
go to the commissary and purchase some Motrin, notwithstanding
his request to see a physician.  Id. at ¶ 28.

On June 9th 2000, Plaintiff submitted a request slip to
either Dr. Falor or to Dr. Harper concerning his medical
problems.  The following day, on June 10, 2000, Plaintiff asserts
he "fell seriously ill and suffered physical injury from the
contraindicated medication, lipitor (atorvastatin), resulting in
profuse internal bleeding, excruciating liver and side pain, and
paralysis of the upper body." Doc. 3 at ¶ 31.  Specifically,
Plaintiff claims he felt a sharp pain and on his way to his cell
he felt another sharp pain, causing him to fall to the ground,
whereupon he alleges that blood "gushed from the plaintiff's
mouth."  Id. at ¶ 34.  A corrections officer radioed for medical
help.  Id. at ¶¶ 35 - 36.  Personnel from the medical department,

11

including the nurse, arrived at the scene.  Falor Aff. at ¶ 18.
This incident occurred around 5:40 p.m. Id.  Plaintiff apparently
told the nurse who arrived that he had thrown up. Id.  Plaintiff
was wheeled to the medical unit where an EKG was performed and he
was given Maalox.  Doc. 3 at ¶ 36.  The EKG was normal. Falor
Aff. at ¶ 19.   The nurse provided a saline solution for
Plaintiff intravenously.  Doc. 3, at ¶ 37.  However, she did not
provide him with pain medication "or any other medical attention
for liver complications, bleeding ulcers, or possible internal
infection[.]" Doc. 41 at ¶ 37.  Plaintiff was placed in the
infirmary overnight for observation.  Falor Aff. at ¶ 19.   At
some point, the nurse came into Plaintiff's infirmary cell and
told him that after reviewing his medical records, which
indicated that Plaintiff had liver disease and was taking
Lipitor, he could be suffering from complications or he could
have a bleeding ulcer.  Doc. 3 at ¶ 38.   At approximately 6:00
p.m., only twenty minutes after the initial incident, Plaintiff
stated that the pain was decreasing and he was feeling better.
Falor Aff. at  ¶ 20.  While in the infirmary, Plaintiff's vital
signs were taken every four hours and at approximately 9:15 p.m.,
Plaintiff stated that "the pain had pretty well stopped."  Id. at
¶ 21. The medical progress notes taken contemporaneously with the
incident, support Dr. Falor's affidavit.

Plaintiff's complaint, in contrast, signed more than one year after the incident, alleges that "for the duration of the night Plaintiff suffered from tremendous body pain and internal liver discomfort without seeing a doctor or taken to an outside hospital for his injuries for treatment in an emergency situation." Doc. 3 at ¶ 40.  The amended complaint signed more than two years after the incident and also not sworn to and so incompetent to serve as evidence for summary judgment purposes,[7] alleges that "the nurse on duty was alerted to the severe pain and internal organ complications the plaintiff was suffering when he asked to be sent to an outside hospital but the nurse only replied, 'you'll have to wait until you see a doctor.'" Doc. 41 at ¶ 40.   On June 11, 2000, Plaintiff's vital signs were normal and he had an appetite and he was discharged from the Infirmary after being seen by Dr. Harper.  Id. at ¶ 22.

In contrast, Plaintiff's complaint alleges that "Defendant Harper was told about the serious pain, blurred vision, discomforting liver activity and the internal bleeding that had taken place while asking to be taken to a hospital.  Defendant Harper said that an appointment was scheduled for June 13, 2000,

_____

[7] Nix v. O'Malley, 160 F.3d 343, 347 (6th Cir. 1998)); Baxter v. Railway Express Agency, Inc., 455 F.2d 693, 696 (6th Cir. 1972) ("[t]he unsworn averments of a complaint will not suffice, on motion for summary judgment, to put in issue facts set out and sworn to in an affidavit supporting such motion."). Although the court could refuse to consider the allegations in the amended complaint as being unsworn for purposes of resolving this summary judgment motion, the court will nonetheless consider them.

13

to see him [Plaintiff], and then said the plaintiff would be
released and abruptly walked away." Doc. 3 at ¶ 48. <u>See also</u>
Doc. 4, at ¶ 48. On June 12, 2000, Plaintiff was seen by Dr.
Harper who found that Plaintiff was asymptomatic and that he was
not coughing or spitting up blood and that he was stable. Falor
Aff. at ¶ 23. Plaintiff complains that "only a cursory
examination was conducted consisting of the use of a stethoscope
on the back area for about five seconds." Doc. 3 at ¶ 49.
Plaintiff concedes that Dr. Harper asked Plaintiff to inform him
if any more bleeding occurred. <u>Id</u>. at ¶ 50. Plaintiff submitted
a request to Dr. Falor to discuss the cause of Plaintiff's
symptoms that occurred on June 10. <u>Id</u>.

On June 13, 2000, Plaintiff attended sick call, asking to
see Dr. Falor. <u>Id</u>. at ¶ 51. On that same day, Defendant Falor
examined Plaintiff's charts regarding the possibility of an
interaction between the antifungal cream, Micatin, that was
prescribed for Plaintiff's groin rash and the oral Lipitor that
Plaintiff was taking. Dr. Falor discontinued both the Micatin
and the Lipitor, placed Plaintiff on a cardiac diet for 90 days
and prescribed Lobid and indicated that if Plaintiff needed to
see a physician, Plaintiff should be scheduled to be seen by Dr.
Falor. Falor Aff. at ¶ 25. Plaintiff filed a grievance which
he did not include in the record. Doc. 3 at ¶ 53. The grievance
apparently concerned the fact that no one had explained to him

14

the cause of the June 10th incident.  See Doc. 3, Exhibit B 3.
In a response dated June 16, 2000, Charles Rossi, the medical
administrator, explained that Plaintiff was not given any
information as to the cause of the incident as they were not
aware of the cause.  Mr. Rossi further explained that Dr. Falor
surmised that the cause of the incident might have been a rare
adverse interaction of the medications Plaintiff was taking.  Id.
Mr. Rossi further informed Plaintiff that as a result of Dr.
Falor's concerns, Plaintiff's medications were changed.  Id.

On June 15, 2000, Plaintiff went to medical, described his
medical problems of "blurred vision, serious body pain and
soreness, discomforting liver activity such as heaviness in the
liver, inflammation, feelings of fluids leaking around the side
area, fluttering and trimmers [sic] in the liver" and he asked
for a "medical lay in."  Doc. 3 at ¶¶ 54 & 55.  Plaintiff asked
Defendant Solarczyk for a medical lay-in but Defendant Solarczyk
allegedly stated that "there was no need for a medical lay-in and
the information would be forwarded" along, and then sent
Plaintiff back to the block.  Id. at 56.  Defendant Solarczyk
ordered a "metabolic panel," which includes a number of blood
studies that can provide information indicative as to the status
of Plaintiff's health.  Falor Aff. at ¶ 26.

On June 16, Plaintiff was examined by Dr. Falor.  Plaintiff
expressed concerns about the possibility of internal bleeding,

15

possible infection and also requested a medical lay-in.  Doc. 3
at ¶ 57.   Defendant Falor told the Plaintiff that the blood
which came out of Plaintiff's mouth during the June 10th incident
probably came from Plaintiff biting his lip or jaw and also said
that the other symptoms were caused by a reaction between Lipitor
and the Micatin.  Id. at ¶ 58.  Plaintiff complains that Dr.
Falor "further attempted to trivialize the plaintiff's medical
condition using medical jargon about the percentages of adverse
effects on users of the drug lipitor."  Id. at 59.  See also Doc.
41 at ¶ 59 (alleging that Dr. Falor "ignored and disregarded the
complaints of the plaintiff's pain, liver discomfort, and/or
ulcers indicated by staff relating to internal bleeding, and
provided no medical care.").  Plaintiff further complains that
"[d]espite the knowledge of the plaintiff's medical condition of
liver disease and injuries defendant Falor failed to provide
medical care or medical lay-in saying he would see how things
turned out before issuing a lay-in, then sending the plaintiff to
his block."  Doc. 3 at ¶ 60.  See also Doc. 41 at ¶ 60.  Dr.
Falor indicates that during his June 16, 2000 examination,
Plaintiff informed Dr. Falor that he signed off of the cardiac
diet which Dr. Falor prescribed for Plaintiff because "of the
hassle of being on it."  Falor Aff. at 27.  Dr. Falor also
apparently found "no objective findings" and told Plaintiff he
would follow up with Plaintiff after receipt of lab reports.  Id.

16

On June 18, 2000, Plaintiff submitted a request to Dr.
Falor, informing him that Plaintiff did not want to take the
Lobid, i.e., the new medication that Dr. Falor had prescribed for
Plaintiff's elevated level of blood lipids.  Plaintiff wrote,
"I'm not sure what you prescribed and you've not spoken with me
as to what it is nor have I spoken with Dr. Harper about the side
effects and so forth."  Doc. 3,  Exhibit B 4.  Dr. Falor wrote in
response, "you said you had muscle pain on lipitor. That's
possible.  You didn't know why you felt bad June 10.  I explained
that there might have been a rare interaction between your
lipitor and Micatin.  You have elevated serum cholesterol that
can shorten your life.  I offered the lobid and explained it to
you 6-16-00.  Now it is discontinued.  You may talk with the PA
if you have questions."  Id.  On June 19, blood tests were
conducted checking for lipid/cholesterol and Plaintiff returned
the lobid medication because it, too, was allegedly
contraindicated for those suffering from liver disease.  Doc. 3
at ¶ 67.  See also Doc. 41 at ¶ 67.

On June 22, 2000, Plaintiff attended sick call and asked
Defendant Solarczyk to see Dr. Harper.  Defendant Solarczyk told
Plaintiff he could not see Dr. Harper because Dr. Harper had a
private practice and could only be seen if there was a referral.
Doc. 3 at ¶ 69.  Plaintiff then told Defendant Solarczyk that he
was in a great deal of pain and experiencing "internal

complications of the liver which constituted seeing a doctor for outside hospitalization.  The plaintiff then asked to see defendant Falor again about his medical problems, but defendant [Solarczyk] said 'There is no real need, plus, you already seen Dr. Falor and your recent blood test came back normal." <u>Id</u>. at ¶ 71.  Plaintiff complains that he was "intentionally delayed or denied access to a doctor and was sent back to his block." <u>Id</u>. On June 30, 2000, Plaintiff was called to medical to communicate his medical problems but Defendant Solarczyk told Plaintiff that "I don't see any problems since blood test results are showing normal function, we'll have a follow up."  Doc. 3 at ¶ 74. Plaintiff complains that again he was not seen by a physician. On July 14, 2000, Plaintiff was called to medical again and was seen by Dr. Falor about an evaluation for outside medical care. <u>Id</u>. at ¶ 76.  Plaintiff was "given a cursory medical examination with a stethoscope on the back area for about 10 seconds." <u>Id</u>. at ¶ 77.  Defendant Falor was asked about liver complications, and told about Plaintiff's persisting pain but Defendant Falor addressed only cholesterol levels and disregarded Plaintiff's complaints about pain and other medical concerns.  <u>Id</u>. at ¶ 78. Plaintiff also asked Dr. Falor about treatment for his groin rash as it had gone untreated since Dr. Falor discontinued the Micatin after the June 10th incident.  <u>Id</u>. at ¶ 82. Defendant Falor told Plaintiff it would be reordered and asked Plaintiff to inform Dr.

18

Falor if there was anymore bleeding.  Id. at ¶ 83.  Plaintiff
complains that at no time did Dr. Falor discuss with Plaintiff
the need for outside medical treatment.

Plaintiff contends that actions of Defendants Falor, Harper
and Solarczyk, as recounted above, constituted a failure to
"provide adequate medical care in an emergency situation before,
during and after injury [that occurred on June 10, 2000] and
despite the knowledge of internal bleeding pain and serious liver
problems, denied medical care on non-medical grounds. . . ."
Doc. 3 at ¶ 158.

The heart of Plaintiff's complaint against Dr. Falor appears
to be that Dr. Falor did not refer Plaintiff to an outside
medical provider and did not provide pain relief.  The record
indicates that Dr. Falor was not deliberately indifferent to
Plaintiff's serious medical needs.  As for the incident on June
10, 2000, there is no evidence that Dr. Falor was, on that date,
made aware of the incident.  However, on June 13, 2000, Dr. Falor
examined Plaintiff's chart "regarding the possibility of an
interaction between the antifungal cream [Plaintiff was
prescribed] . . . and the oral Lipitor[.]"  Falor Aff. at ¶ 25.
Dr. Falor discontinued both medications and placed Plaintiff on a
cardiac diet as a way of treating Plaintiff's high cholesterol.
Plaintiff concludes, without any evidence in support thereof,

other than his mere supposition, which is insufficient,[8] that the June 10th incident was the result of liver disease being aggravated by the Lipitor,[9] and not, as in Dr. Falor's medical opinion, a result of negative drug interactions.  Falor Aff. at ¶ 34.

The record on summary judgment simply does not support a finding of either prong of an Eighth Amendment violation.  The evidence does not indicate that Dr. Falor knew of and disregarded an excessive risk to Plaintiff's health or safety.  That Dr. Falor failed to obtain outside medical treatment for Plaintiff's June 10, 2000 incident does not constitute evidence that Dr. Falor was deliberately indifferent to Plaintiff's serious medical needs.  Rather, at most, it indicates that it was not Dr. Falor's professional medical opinion that such outside care was needed. See Doc. 3 at ¶ 98 (Dr. Falor told the plaintiff that "there was no need to be taken to an outside hospital. . ."); Falor Aff. at ¶ 55 ("I believe that Mr. Hemingway's medical treatment was appropriate and was well within the standard of medical care.").

---

[8]  See, e.g., Laird v. Cragin Federal Bank, 41 F.3d 1510 (Table), 1994 WL 609920, *7 (7th Cir. 1994)("We again emphasize that general and vague opinions, suppositions, conclusions and unsupported statements of fact will not suffice to meet a non-movant's burden to respond to a properly supported motion for summary judgment."); Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (a properly supported summary judgment motion may not be defeated by conjecture or surmise).

[9]  See Doc. 87, Plaintiff's declaration at ¶¶ 8-9.

In addition, Dr. Falor was not deliberately indifferent to Plaintiff's complaints of pain.  Notwithstanding the repeated entries in the medical chart of no objective findings with respect to Plaintiff's complaints of pain, id. at ¶ 32 & ¶ 48, ¶ 51,  Dr. Falor did prescribe Motrin in September 2000, and referred Plaintiff to physical therapy on September 25, 2000 and on October 6, 2000.  Id. at ¶ 40,  ¶ 48, ¶ 50.  Plaintiff was non-compliant with the physical therapy.  Id. at  ¶ 51. Plaintiff contends that the physical therapy was ineffective, although he acknowledges that he did receive some relief.  Doc. 3 at ¶ 111.  Given Plaintiff's continuing complaints of pain, X rays were conducted of Plaintiff's spine.  Falor Aff. at ¶¶ 45-46.  Given the ongoing complaints of pain, Plaintiff was referred to an outside neurologist by the name of Dr. Hoffman. Id. at ¶ 53.  Dr. Hoffman opined that Plaintiff did "not have any signs or symptoms of radiculopathy.  Mr. Hemingway's T spine films did show some degenerative disc disease, but that cannot account for his symptoms.  He does not appear to have muscular dystrophy.  Mr. Hemingway does not have the myotonic features of myotonic dystrophy. There are no features of exercise induced myalgias as in McCardle's Disease.  A CXR did not suggest sarcoidoisis, which can be associated with myalgias and myopathy. The patient does have active hepatitis C and liver disease has been associated with myalgia."  Id. at ¶ 53.  Significantly, Dr.

Hoffman specifically concluded that Plaintiff's chronic pain ("myalgia") was "not Lipitor related."  Doc. 85 Ex. G at unn. p. 4.   This record does not support a conclusion that Dr. Falor was deliberately indifferent to Plaintiff's ongoing complaints of pain or that Dr. Falor was indifferent to Plaintiff's requests for outside medical attention when, in Dr. Falor's opinion, such was warranted.  This is true even taking into account Plaintiff's contention in his complaint that Dr. Falor's referral of Plaintiff to outside treatment for the lump on his genitalia was "only an attempt . . . to show they were not bias [sic] or disregarded requests for outside medical attention. . ." Doc. 3 at ¶ 133.  At most, Plaintiff's case presents a disagreement with the course of treatment given him, which does not state a violation of the Eighth Amendment.  <u>See, e.g.</u>, <u>Snipes v. DeTella</u>, 95 F.3d 586, 591 (7th Cir. 1996) (inmate's disagreement with doctor's chosen course of treatment does not amount to deliberate indifference).  Accordingly, summary judgment should be entered in favor of Dr. Falor and against Plaintiff on his Section 1983 claims.

### 2.   <u>Defendant Harper</u>

Plaintiff alleges that the above recounted facts reveal Defendant Harper's deliberate indifference to Plaintiff's medical needs in relation to the June 10, 2000 incident.  Plaintiff complains that notwithstanding his subjective complaints and

request to be taken to a hospital after the June 10, 2000
incident, Dr. Harper released Plaintiff from the infirmary on
June 11 and told Plaintiff a follow up appointment was scheduled
for two days hence.   Plaintiff further complains that Dr. Harper
conducted only a cursory examination of him on June 12.  Doc. 3
at ¶ 49.  Plaintiff does not appear to contest, however, that Dr.
Harper found Plaintiff to be asymptomatic on that day.  Falor
Aff. at ¶ 23.  Even if it were true that Dr. Harper conducted
only a cursory examination of Plaintiff, this does not establish
deliberate indifference on Dr. Harper's behalf.  See Unterberg
v. Correctional Medical Systems, Inc., 799 F.Supp. 490 (E.D. Pa.
1992).  In Unterberg, a plaintiff-prisoner claimed that the
treatment she received was perfunctory and, therefore,
constituted an Eighth Amendment violation.  Id. at 495.  In
rejecting this claim, the Court concluded that perfunctory
treatment, although it might constitute medical malpractice, does
not amount to a constitutional violation.  The court noted that

> [i]n Hampton v. Holmesburg Prison Officials, 546 F.2d
> 1077 (3d Cir. 1976)], the Third Circuit made clear that
> medical malpractice alone will not give rise to an
> Eighth Amendment claim.  Hampton specifically states:
>
>> to establish a constitutional violation, the
>> indifference must be deliberate and the
>> actions intentional....   Neglect,
>> carelessness or malpractice is more properly
>> the subject of a tort action in the state
>> courts.

Id. at 497.  In the instant case, at most, Plaintiff's complaint alleges perfunctory or inadequate treatment which is insufficient as a matter of law to make out an Eighth Amendment claim.

In addition, Plaintiff suggests that Harper did not help him to get outside medical assistance.  This assertion also fails to state a claim.  See Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care").

Accordingly, summary judgment should be entered in favor of Dr. Harper and against Plaintiff on his Section 1983 claims.

### 3.   Defendant Solarczyk

Plaintiff's claims against Physician's' Assistant Solarczyk essentially amount to a claim that he delayed and denied Plaintiff access to physicians before and after the June 10, 2000 incident, see Doc. 3 at ¶ 157, Doc. 41 at ¶ 157, and that he failed to provide adequate medical care before, during and after the June 10, 2000 incident, despite his knowledge of internal bleeding, pain and serious liver problems.  See Doc. 3 at ¶ 158. The factual basis for these claims is that on May 20, June 5, June 15th, June 22nd and June 30th, 2000, despite complaints of symptoms by Plaintiff, Defendant Solarczyk refused to refer Plaintiff to see a physician.  However, none of the encounters with Defendant Solarczyk that Plaintiff complains of support the subjective component of an Eighth Amendment violation.  At most,

the summary judgment record shows that Defendant Solarczyk exercised his professional judgment to decide that Plaintiff's complaints did not warrant the need for Plaintiff to be seen by a physician.  For example, Plaintiff's own complaint demonstrates that on May 30th, Defendant Solarczyk believed Plaintiff's symptoms were related to side effects from the Lipitor and that they should resolve themselves in time.  Doc. 3 at ¶¶ 24-25. Or, to take another example, on June 15, Plaintiff requested a medical lay-in from Defendant Solarczyk, who felt there was no need for such and, thus, denied the request but Solarczyk did indicate that Plaintiff's complaints would be forwarded on, presumably to the doctors.  Doc. 3 at ¶ 56.  On that date, Defendant Solarczyk did order a metabolic panel which includes a series of blood tests that can provide information indicative to the status of Plaintiff's health.  Falor Aff. ¶ 26.  Indeed, nothing in the summary judgment record establishes the second prong of the Eighth Amendment with respect to Defendant Solarczyk's actions.  Indeed, the record tends to establish that Defendant Solarczyk was exercising his professional judgment in assessing the needs of Plaintiff and in determining whether Plaintiff needed to be referred to a physician.  See, e.g., Thornton v. U.S. Dept. of Justice, 93 F.Supp.2d 1057, 1065 (D. Minn. 2000) (noting that Nurse "Noll's decision not to refer plaintiff for emergency treatment [by a physician] constitutes an

exercise of medical judgment that, in hindsight, may have been erroneous.  Under these circumstances, however, no reasonable inference arises that she knew of a serious medical risk to plaintiff and chose to disregard it.  Moreover, plaintiff has failed to demonstrate that his need for emergency hospital care, as opposed to the treatment that Noll administered to him, was so objectively obvious that her actions can be deemed deliberately indifferent.").

In addition to the federal Section 1983 claims, Plaintiff asserts state law claims of negligence.  Although the Defendants moved for summary judgment on the negligence claims as well, in light of the recommended grant of summary judgment on the federal claims, upon which the federal Court's jurisdiction was predicated, there does not affirmatively appear on the record any reason for the court to exercise supplemental jurisdiction over the state law tort claims.  See, e.g., Boneburger v. Plymouth Township, 132 F.3d 20, 23 n.1 (3d Cir. 1997)("where federal claims are dismissed before trial, the district court 'must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'")(quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995));  28 U.S.C. § 1367(c)(3), which permits a district court to "decline to exercise supplemental jurisdiction over a [state

law] claim ... if [it] has dismissed all claims over which it has original jurisdiction . . . ." The grant of summary judgment by a court on the federal claims is included within the meaning of phrase "dismissed all claims." <u>Tully v. Mott Supermarkets, Inc.</u>, 540 F.2d 187, 196 (3d Cir. 1976) ("If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances."). Should the district court dismiss his federal claims and decline to exercise supplemental jurisdiction over his state claims, Plaintiff will have at least thirty days from the date of the district court's order in which to file the state law claims in state court. 28 U.S.C. § 1367(d).

<u>CONCLUSION</u>

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of the

objections to respond thereto.  Failure to timely file objections
may constitute a waiver of any appellate rights.

                              Respectfully submitted,


                              /s/ Amy Reynolds Hay
                              AMY REYNOLDS HAY
                              United States Magistrate Judge


Dated: 23 August, 2005

cc:  The Honorable Alan N. Bloch
     United States District Judge

     Charles Hemingway
     CQ6107
     SCI-Graterford
     P.O. Box. 244
     Graterford, PA 19426

     A. Tracey Campbell
     White & Williams
     1235 Westlakes Drive
     Suite 310, One Westlakes
     Berwyn, PA 19312-2416